Next case on today's docket is the case of The Matter of Estate of Michael Herrin, deceased, versus the head, versus Dr. Roger Herrin, administrator of The Estate of Michael Herrin, deceased. We have Mr. Dorris for the appellant and Mr. Womack for the appellee. And you may begin, Mr. Dorris. Thank you very much. And I am Mr. Dorris. I'm Doug Dorris from Howick and Dorris Stone. Well, I know you're a lawyer, Mr. Dorris. Not necessarily, Mr. Dorris. Nothing to do with the lawyer or anything like that. This case has been, this is the third appeal out of this accident. There was also a rehearing, so it might seem like four. To understand why I am here on this probate appeal, I'd like to just real briefly go over the background of that so everybody's on the same page. I know Justice Welch was here in January on the panel when we argued it, so he knows it. And I apologize for going over it again, but I think it helps just give a real quick overview of what's going on. There were four children, I mean, there were four people in a Jeep, three of them children. A wreck occurred, torque feeser hits the Jeep. Unfortunately, Michael Herrin, one of the children, was killed. Two of the other children were hurt. One is my client, Jared Head. There was, Encompass had issued to the Duncans who owned the Jeep and the mother, Duncan, Catherine Duncan, was driving. Encompass provided underinsured coverage. There was extended litigation, protracted litigation to stack that coverage. That was the first appeal. It stacked to 800,000. There was also complicated litigation, protracted litigation in the trial court. While the parties attempted to stack and were successful in stacking, the $5.5 million in underinsured motorist coverage, Dr. Herrin carried exclusively through some nursing homes. And that underinsured coverage in earned only to Dr. Herrin and his family for Michael's wrongful death. Dr. Herrin made the decision at one point to sell the $5.5 million, his wrongful death claim, against the $5.5 million pool of outside insurance for $1.65 million. Then Dr. Herrin made an attempt to claim the major portion of the $800,000 of underinsured coverage that was available on the Duncan Jeep, on the policy that the Duncans had purchased. We thought, Jared Head and the Duncans, argued that the controlling case law on how underinsured proceeds are distributed in that situation, there's multiple claimants in a single vehicle. And by the way, the Heads, Jared Head and the Duncans, had no outside source of underinsured coverage. They just, they didn't have coverage that exceeded the amount of the tort fees. But Jared Head and the Duncans argued to now retired trial judge Ron Ethis, that the James case should control the distribution, James versus Western States. James is the main case, I think the only case in the state, that really controls that. That type of situation. It's entirely unappealed, it's still pending, but basically the theory of James is, that the occupants of a vehicle like that, who don't have outside sources of underinsured coverage, get preferential treatment to that host policy, host vehicle policy, until they're placed on equal footing with the occupants who have these outside sources of coverage. In this case, it's 5.5 million available to Dr. Heron. And I think James holds that the Heron estate cannot participate in the distribution of the $800,000 of host vehicle UIM coverage until the Jared Head and the Duncans are placed on equal footing. And in this case, what that means, practically, is that they can't participate because in the distribution of UIM coverage on the policy bought by the Duncans, because Heron had $5.5 million available from another source, except $1.65 million from another source. Judge Ickes disagreed in the interpretation and the application of the James case. Judge Ickes used a complicated ratio formula. That issue's on appeal in 5-10-37 on the other appeal that was argued in January. But Judge Ickes awarded the Heron estate $677,851 of that $800,000 of host vehicle money. Of course, Jared Head and the Duncan family disagreed with Judge Ickes' interpretation and application of James. We filed an appeal. That appeal is still pending. While that appeal was still pending, it was already filed at the time, Dr. Heron filed a motion in the circuit court of Saline County to compel distribution of his $677,000 of that $800,000 policy. We opposed it. The Duncans and Jared Head opposed it. We filed motions to stay in distribution. We filed a total of four different motions. Judge Ickes disagreed with us. Judge Ickes ruled that on July 7, 2010, he entered a docket order that said the distribution may proceed pursuant to Supreme Court Rule 305, any necessary bonds to be filed. He entered that docket in the MR case in Saline County in which he made the decision about how to distribute the $800,000 of money. We then, at that point, an appeal was still pending. Dr. Heron, at that point, made the decision to open a new probate estate, a brand new probate estate, number 51037 in Saline County. It was opened without notice. It was opened without publication, you know, any kind of notice in the newspaper. No bonds were supplied by Dr. Heron. No sureties were supplied by Dr. Heron. It was opened on July 7, 2010, the same day that new probate estate was opened. The money from Judge Ickes' MR file was placed into that probate estate, and that same day that it was opened, without notice, without publication, without bonds, without surety, that money was distributed to the wife of, I'm sorry, to the mother of Michael Heron and to the siblings of Michael Heron. $600,000 went to them. $70,000 to $7,000 went to attorney fees. Jared Head, my client, found out informally of these rapid maneuverings through the clerk's office after the fact, I might add. We filed immediately a motion, well, within 30 days, a motion to require that Dr. Heron supply a bond for that distribution. In that verified motion, we pointed out to the Probate Court of Saline County that no bond had been posted. We pointed out that there was a pending appeal in this court as to the ownership of those funds. We argued that those were not typical wrongful death funds, that those indeed are funds that were highly disputed, the ownership of which is highly disputed, that pending the outcome of this appeal that was pending in this court, Dr. Heron's estate might have claimed to none of those funds. Judge Todd Lambert was the judge that signed the probate order to allow the distribution in one day. But when we filed our motion to require the posting of a bond, Judge Lieberman, Joe Lieberman, was assigned the case. He heard the case. He ruled that we, that Jared Head, had no standing before that court to argue for a bond. His exact reasoning is not clear. He did not write an opinion. He did not make an involved docket entry in the sheet. But I'm assuming that his reasoning was that because these were wrongful death proceeds, we weren't an heir, that we had no standing therefore to be heard. We then filed a motion. Well, while Judge Lieberman was considering our motion for bonding, he finally entered an order on that. And three days after he had an order that we had no standing, then Dr. Heron filed a motion to terminate the estate to approve the final account. We weren't notified about that. There was no hearing about that, which we were allowed to attend. Judge Lieberman entered a docket entry that said, I'm terminating the estate, approving the final account. And then he said, send the courtesy copy to Doug Doris on behalf of Jared Head, because he'd been in the file and tried to come in. When I got the courtesy copy, I then filed a motion to reconsider our standing, a objection to the final account, and I filed a claim, an estate claim. And at that point, all of them are verified documents. They're all long documents. They all contain verified allegations that this appeal was pending in this court, that these funds were disputed, that depending on the outcome of the appeal in this court, those funds which had been distributed might not even belong to the estate. And Judge Lieberman, consistent with his earlier ruling, denied my objection, denied to the final account, and basically said again that I had no standing to appear in front of that court and object to these funds being, in my interpretation, rushed through the probate estate and distributed so that regardless of what happens on this appeal, the money's gone, and they could say, well, you know, the money's gone. Now, good luck trying to run it down. I then filed this appeal, and here we are in this appeal. I think that it makes no judicial sense for me to have standing to be able to litigate ownership of the UIM funds, uninsured motorist funds, in the MR case in Saline County, to have standing to come before this court and argue the James appeal that is pending, and yet be told by a Saline County probate judge you have no standing to even be heard. I believe the law is quite clear under the Probate Act that bond is required. That's 12.2 and 12.5 of the Probate Act. It's clear that sureties are required. Those weren't provided. That's Section 12.3 of the Probate Act. I think the Probate Act also clearly mandatorily requires that if there's going to be a distribution before the 12-month period, the claims period, that that can be done, but it has to be done with approval of the court, and it has to be done after hearing, and the distributees, in this case, which would be Dr. Heron's children and Dr. Heron's ex-wife and mother, Michael, would have to give a bond surety in case this court reversed the finding of Judge Ickes on the distributed shares. That wasn't done. I think the Probate Act requires 18.3, the publication, notice, I mean notice to be published three weeks in local newspaper. I think the Probate Act requires that a statement be kept open for the requisite six-month claims period. I think clearly when we step before the court and say that money belongs to us, it's UIM money, and under James we should have it, that we have standing as a claimant. Judge Lieberman says that we don't have standing to make any of these arguments. I think that's clearly wrong. Mr. Walden, in his brief, in the Apple East brief, basically distilled the arguments down to this. He did not dispute that the Probate Act applies. He did not dispute my interpretation of the Probate Act. He really didn't argue that there was any real good reason not to require a bond surety for the distribution just to simply protect the money if distribution is going to be made while an appeal is pending. What he basically argued is that we have no standing in this appellee's brief, and therefore I assume that's the only issue that can now be argued because nothing else was briefed, nothing else has been briefed on his behalf. But he basically claims there was no estate claim filed, and therefore we have no standing. He made that argument on all six pages of the Apple East six-page brief. Clearly in the record, I provided you a copy, and the citations are there. Clearly we did file an estate claim. It was a pilot estate claim. I'm confident that Mr. Womack's office simply overlooked it, I guess, in writing their Apple East brief. By the way, that estate claim has never been denied, never been granted. No hearings have been had in the probate court. It just sits there. I think that is basically the situation before this court. This court might ask, well, what can be done now? What should we do? That money is gone. It was distributed the day the estate was open. Well, my prayer for relief is that Dr. Herrod, who the record established in the previous appeal, is a man who owns nursing homes, who owns golf courses, who owns banks and things like that. He can put up a bond. He can be bonded for the early distribution. If a bond is there and this court reverses the distribution of the $800,000, then I think that provides us with an opportunity to go after the bond and make him pay back the money that should never have been distributed, that actually was not the property of the estate. Can I ask you a couple? And it might not be totally relevant to this appeal, but just to get an understanding of the case, in 5-1037, you said Judge Ickes's order said any necessary bonds to be filed. Correct. What kind of bond was he talking about? You know, Your Honor, I don't know. I honestly disagreed with his decision. I was baffled by his decision. We're not a judgment debtor in that case. We're all the occupants of that vehicle are judgment creditors. He said under Rule 305, it's a 7-6-2-10 docket entry. It's a C-23 of the record. He wrote distribution may proceed per SCR 305. That's not the probate act. That's the Supreme Court rule having to do with appeals. So he ruled that bonds should be, and then he said any necessary bonds to be filed. He didn't say us. He didn't say Mr. Balmy or the Heron estate. He said any necessary bonds to be filed. The only thing that I can conjecture, the only conjecture I can reach is that what he was stating is if the money was going to be distributed through the MR case, that bonds should be supplied, you know, to protect. Of course, nobody issued any kind of bond or anything like that. There was no stay in place. There was no. We had asked, like I said, and I cited in my brief, four different occasions. We'd asked a motion. We filed a motion for a stay, and it was denied. And I think there's a good argument that Judge Ickes didn't even have jurisdiction at that point because it was 55 days after the decision had been entered, distributing the funds, and we'd take the case up on appeal. And that was one of the first things he asked us is, do I even have jurisdiction? And we thought no, and he went ahead and ruled anyway. Now, on the claim that you made in the probate estate, the case before the court today. Yes, sir. At that time, I don't know if the correct terminology, but you did not have a liquidated claim. That is correct. Now, is there any problem with standing when a creditor comes in without a liquidated claim? I think not. I think the court can take that in. There's no problem with standing. The court can take that into consideration. Now, we clearly have a contingent claim. If this court says, I'm not changing the distribution, the distributive scheme that Judge Ickes came up with, then that $677,000 belongs to the Heron Estate. They can do what they want with it. We did not, by the way, we did not object to the $1.65 million. That was distributed. Those are clearly wrongful death assets, clearly the property of the Heron Estate. That was distributed through the MR case, and we didn't object, wouldn't object. I mean, but the difference here is that these probate funds are hotly contested funds. We claim that the Heron Estate might not hold any of those adjacent property funds. If you are successful in 510-0037 and then you lose this case, if we would affirm this case but reverse the other case, are you without a remedy? I am hurting. I'm hurting badly. I mean, this is a final, the court approved this distribution. The money is gone. Can you track it? I think I can. Under the cases I cited in our brief, I think clearly that the administrator is responsible for early distribution, with or without bonding, of money that was distributed as part of litigation on appeal. The court has said since Abraham Lincoln's time in the Jilton case I cited there in the first bank, first national bank case, I think, in the brief discussion, that this court has said it's been the law literally since 1851, and before then, because they cite all the cases in the 1851 decision, that if I am the judgment creditor and the defendant can't afford bond, which we couldn't in this case, on $700,000, we would go out and buy policies that are very, very high. And I don't think we had to in this case, by the way, because we're a judgment creditor in this case. But anyway, the law, I think, is very clear in Illinois that if the judgment creditor goes out and distributes those funds that he gets from the judgment debtor while the case is on appeal and then the judgment debtor wins, ultimately wins the appeal, so there never was a judgment, an enforceable judgment, the judgment debtor can go after the judgment creditor and get his money back. You can still go after him, but obviously it's a lot easier if we have a bond, then we just go against the bond. And really our appeal is tell the appellate court, I'm sorry, I'm sorry, have the appellate court tell the probate court, number one, we have standing, and number two, require Dr. Heron to have a bond. If you need a hearing to determine the bond should be less than twice the judgment, I'm fine with that. Mr. Dorsey, you'll have the opportunity to comment. Mr. Womack? The first thing I need to resolve with Mr. Dorsey is the factual issue. Mr. Dorsey, who is in cable line, stated that he attached all this stuff to the record. I've got the docket entries attached to his initial brief and the sequence of events. What page in the appendix are you on? It's C2, Judge. It starts on C2. A2, C2. Okay. 510-503-C1 is where it starts. It's where the state's open. And C2 is the docket entry from August 11th through the 20th. August 20th is when the judge found there was no standing. And at the time that decision was entered, the only thing before the judge was a motion to require bonding. The next page, C3, goes through 823-92. And 9-2, the final account received and approved. Case is closed. 9-17. Objection to approval of the final account. Motion to reconsider. 9-22. Motion to reconsider. Denied. I don't see in there anywhere, and I don't have it in my file, it's not in the docket entry, where a claim against the estate was ever filed. The trial court's decision didn't pertain to whether there was a claim against the estate or not. I thought he said the claim was after distribution. I'm sorry? I thought he said the claim was filed after distribution. What he claims is it was filed on September 17th. And on September 17th, there's nothing there. And I don't see it in the docket entry. I've got it in front of me. I don't have a copy of it. I never, I don't have a copy of it in my file. I never saw a copy of it. There's no claim. Fine. Did Doug attach a copy of it to his reply brief? He's got it in his reply brief. It's filed September 17th, Appendix A-30. It's a state claim. Yes. I don't see it in the docket entry, and I don't see it in his original claim. I was not aware of a claim that a claim had been filed until I saw the reply brief. Well, if it did appear in the original record and we'll have that, would that affect your argument? No. It does to a degree because my argument is based on whether or not there's a claim to file. But it goes back to the whole nature of this transaction. What you're talking about here is not something insignificant. It's not a big deal. In this case, as Doug has alleged in every motion he's ever filed, Dr. Heron's wealthy. So is he injured or not, I don't know. He keeps telling me how wealthy he is. Maybe I should raise my feet. I could have offices in Memphis and St. Louis and whatever. It could be just that. In any event, the case was filed by special administrator. There's no requirement that there be an estate open anytime, anywhere, period, anyhow. Special administrator filed the estate. There's no requirement that a special administrator do anything other than that. And the money could have been paid out. The law is well known by all of us, I think, that the claim in a wrongful death suit is that of the heirs, of the family, the children and mother, wife, et cetera. In this case, the sibling's wife and father of the deceased. It's not an asset. Never is, never has been, never will be an asset of the estate. We hear all this nonsense about filing publication. You publish so that the inventory listing assets can be protected so that the claim can be made against the estate. This is not a claim against the estate. There's no law out there anywhere that required any of this to have been done. There's no law that says that the special administrator has to do anything. Now, if the case is reversed, do they keep the money? No. You've got unjust punishment and all kinds of other issues, legal issues out there that can cover it, including actions against the special administrator himself or against the family members. But a stranger to the estate cannot come in and request that the court impose a bond. There's just nothing that allows that to be done. And there's no requirement that a special administrator even post a bond to distribute money if the estate funds have been paid directly to the brother, sister, mother, and father. They get a release. The only people that can get the release are the family. The only people that can raise the issue are the family members. So it's just not there. There is no right, there's no obligation for the special administrator to do anything. In this case, it was filed mainly for bookkeeping purposes. And distributed. And there was no claim of any kind filed until after the estate was closed. Are you saying the special administrator would be liable for these funds if 510037 is reversed, sent back to the trial court, and there is a redistribution? No. I'm saying he might be. I'm saying the issue is, did the special administrator do something he shouldn't have done? And he wouldn't appear to be under, if we affirm the disposition in this case, and this case is just done, it's closed. You couldn't go back into it, I guess. I don't know how you could go back into it. Well. And then there is some kind of independent cause of action against the special administrator outside closing the estate. The special administrator still has duties as special administrator. If he's violating those duties, he will be sued. Moreover, so can the people who receive the money. And he's one of those people. He's one of the heirs. The law adjusts and Richmond applies. But judge, this is not unique. There's a theme of law out there that covers this entire issue. It's called stay of appeals. The trial court was asked to stay it and denied it. This court was asked to stay it and denied it. Now, absent a stay, there's nothing illegal, wrong, improper, or anything else about transferring the darn money out. The fact that some people don't want to do doesn't have anything to do with anything. The special administrator would have been willing to do his rights more likely than not. I don't want to try more lawsuits than I have to do. We've had about 10 in this case already. And I don't want to get into how many angels dance on the head of the pen. But I do know that this court denied a request for stay. And this is nothing other than another request for stay. Don't transfer the money out until Obama's supposed to. By somebody who has no interest in the estate at all. I mean, this court judge's serious decision said you've got to be interested in litigation before you can participate. The fact that someday, sometime, someplace, somewhere I might have a claim, it ain't enough. It's just not there. Now, you seem to be concerned, and I don't have any problem with that, about making sure everybody's treated fairly. But you've got steps in place to do that. Trial court said, I think what he meant by that was if a stay is granted to stop the transfer of money, somebody's got to pose a problem. This is a unique situation. There's not a judgment against Roger Hamm as administrator. Never has been. He was thinking in that original 51037 when he said any necessary bonds, that if the stay was denied, then they would post a bond to pay themselves? Is that it? I cannot figure out who was going to post a bond in that case. That's what's got me. I can't either. If he granted the stay, then I think he could have required the people asking for the stay to post a bond. I see. Okay. But he didn't. He didn't. And then this court considered the stay, and this court denied the stay. Well, this court could have granted the stay and said now that you have to post a bond to make sure the money's whatever. Of course, we already got the money. It's like one of those ones where you already got the money. Yeah. So it's going to get paid if it's stayed, but go ahead. That's all right. It's not an instance where you don't have the money or it's not there. It's sitting there like an interplay. Yeah. Okay. Nobody granted the stay. Nobody granted the stay. Two shots at the apple. Nobody granted the stay. Nobody granted the stay. In this case, we do it for mainly booking purposes. Open the estate to pay out to make sure the expenses are covered and handled properly. And somebody who's not a party to the estate comes in and complains to me about it. But I'm just thinking about the danger that you would create if you granted this motion. And every – I've had two or three cases where we've had wrongful death suits filed. And generally speaking, the people want their money yesterday. And most of the time, courts waive their final number of bonds because there aren't any assets in the estate, and the people get their money. There's nobody at risk except the people who have the claim there. So there's nobody to be protected except getting their own money. And what you're proposing, well, the defense would go, I'm sorry, I don't know. What are you planning? Whatever. Whatever he is. Whatever he is. He could have had all the money in the estate. But how did you get the insurance company to put all this money up without – They paid into court. Okay. And the judge distributed it. And they're gone. I mean they got their money in, so they're off. They paid the money into court. I might add over-objection. Tested hearing on that issue, and the court approved it. We heard all this nonsense about the first lawsuit or the second time. I've lost track of the third or fourteenth lawsuit. That's not before you. And even if it is, what he's trying to say there is that Dr. Heron cannot settle an underinsured claim. He has to pay – you have to go by the policy limits, not by whether he should settle or not. And there's no law anywhere. And that's exactly the opposite of her law that this court's ever entered of encouraging settlement of claims. So you're not going to decide that case today, but he raised – I didn't. But what we have here is a decision made by the trial judge deciding the amount of money, deciding how the money should be distributed, denying a motion for stay. And then you have a motion for stay in the appellate court, which the appellate court denied. Now I don't know if you can take that to the screens or not, but it wasn't. Nothing was done. You have the lawsuit filing. There was no administrator of the estate as of the time all of that happened. The special administrator filed the lawsuit. All litigation was done under the name of the special administrator. The estate was open for bookkeeping purposes. And then there's a claim that somebody, somehow, somewhere should have posted a bond, which may be true. I don't know. All I do know is that I kept walking off the street in your mom's estate and claimed that you should be posting a bond. And that's exactly what we have here. We have a possible claim sometime in the future where we might have a lawsuit against somebody. And you heard counsel say, well, how many times have you heard counsel talk about how wealthy Dr. Herring is? A bond would be to enforce his conduct, make sure his conduct was appropriate. You have to find out. The bond doesn't say we get the money back. The bond says that the administrator acted improperly. Did he do something wrong? He didn't do anything here other than what the court ordered him to do, which is pay out money to the people that were entitled to it. Except, you might know from there, he didn't pay anything out to himself. Now, the special administrator, if he'd gone entirely under the Act, could he have done that under the MR file? Absolutely. But he chose not to. I chose not to. Well, he chose not to. But he chose for a reason, for the protection of the Probate Act. No. Well, it's the bookkeeping or whatever, but when you get over into the Probate Act, there's no special rules for special administrator. You're named as the executor of the state, not the special administrator. You've taken on a different role. And commonly, there would be no bond with just the family involved. Commonly, there's no bond with just the family involved. And that's what we have here. But if there had been a hospital lien or something else, but that's all we have. Then that's adjudicated in the trial court level. And now, wantonly, so that the Supreme Court refers to you guys improperly. But it's your position, as an unliquidated creditor, he has no standing to make a claim. As an unliquidated creditor, who may, it's beyond unliquidated. He has a liquidated claim that he disagrees with. Oh, you're saying he lost. Yes. Okay. The court, he said, I want X amount of money. The court said, nope, you get X minus that amount of money. He doesn't have a claim, he doesn't have a judgment against me or against my side or anything like that. He doesn't have a claim. If he had filed a claim against the estate, that the estate would face a large preclusion, what's the claim? At that moment, you can't resolve it until the appeal in 37 is over with. You can't resolve it anyhow. There's still not a claim against the estate. There's still not a claim against the estate. It depends on where the money's at. If the money's sitting in an account that says executor of the estate, isn't the money over there? Two things. First of all, no matter how much, no matter in whose hands it flows, it doesn't belong to the administrator except in trust for the beneficiaries. So he didn't have any legal interest in that money, period, and it was distributed immediately, which is – I mean, this is not – I'm not right. I could be sneaky, but if I wanted to be, this is how it is every day. When I settle a case, we go to the court, judge signs the orders, people get their money. And they want it done. I've got people yelling at me now about two cases that I can't get done. I'm going to do it the same way I did this one. And if you walk off the street and say, golly, you, Mr. Abner, you should have a bond, I'm going to object. You don't have anything to do with that and you can't. I hope, anyhow, you don't change the law in Illinois to allow anybody to come in and tamper with settlements of claims. Thank you. Thank you, Mr. Wolbein. We have rebuttal, Mr. Dorsey. I bet you do. I also have had a couple of wrongful death cases, and I don't want to complicate the law, but we can't change the law either. There is a statute in place. It's under the Probate Act, 755-512-5B, in which it talks about the Probate Act specifically addresses what do you do when you have a cause of action for wrongful death. It says for the purpose of fixing the amount of a bond, a cause of action for wrongful death of deceit or for personal injury to the ward is considered of the value of $500, which we do all the time. You're a special administrator. You get a $500 bond. What section are you on there? 755, Probate Act. 755, ILCS, 5-12-5, page 20 of my original brief, past brief. Then the Probate Act says, but unless excused by the court from doing so, it is the duty of the representative to file in and have approved by the court a bond for an amount not less than double the amount likely to come into his hands as the proceeds of a judgment or settlement if the individual's act assurities. So the Probate Act clearly contemplates that in a wrongful death act, if you're the special administrator, and by the way, Justice Donovan, you hit it right on the head. He's not the special administrator. He is the administrator. There was, in fact, a special administration that was open. It's an old 1P case. He didn't use that. He used the Probate Act. He filed it under 10P32. When he does that, he's got the Probate Act. He's got to deal with the Probate Act. The Probate Act deals with wrongful death suits, and it says $500 bond to make sure the administrator doesn't do anything wrong. In this case, Mr. Wiley argued that he did nothing wrong. He violated the Probate Act on almost everything he did. Dr. Heron did not get a bond. He did not get assurities. He did not post any kind of notice, potential claimants. He brought that money and put it into a probate estate, so now it's absurd to argue that it's not an asset of the probate estate. He opened it. He put it in there. There it is, and he distributed it before the six months. The Probate Act allows you to distribute it before the six months if you do certain things like get surety and make the distributees give surety as well, in case it turns out there's a claim that comes out later. I believe that what normally happens in the wrongful death cases is indeed what Mr. Wiley has talked about, but in those cases, there is no dispute that the funds belong to the heirs of the deceit. Everybody agrees it's wrongful death money. That's exactly what happened earlier in this case with the $1.65 million. Nobody objected. I didn't require a bond at that point. Theoretically, I think he should have put up a $500 bond. The legal argument is Dr. Heron is not authorized or should be authorized to serve in any capacity in any of these cases because he's never put up a bond as a special administrator or as an administrator, so I don't think he's qualified to act, but assuming he put up the $500 bond, then he can act as a special administrator in a wrongful death suit, but he hadn't put up the $500, number one. Number two, he's not a special administrator in this case. He is an administrator under the Probate Act. With a typical wrongful death, if there was a dispute, if there was a lien claimant or somebody that comes in and says, I'm on appeal and that money should never be distributed, then I think there should be a bond put up, and the court can say, I'm going to put it up, make you put it up, give you twice the amount, but wait a minute, you don't need twice. It can be just the full amount or something. I do have an interest in that money. They argue that we have no interest whatsoever. That is underinsured, bonerous money that has been paid into the court, and we claim we're entitled to most of it, more than we got. So do the Dunkins. You use the example of your mother. If you open an estate for your mother and you've got a car in that estate, can you distribute it? You can unless somebody else comes in and says, that's my car. That wasn't your mom's car. That's my car. And then you've got to deal with the claim. Mr. Walmy argues that we didn't file the estate claim. I'm telling you, I prepared it. I filed it. It was filed at the same time that we filed the motion asking them to reconsider, asking the court to set aside the approval and keep the estate open. It's in the court file. It was referred to in my brief where I filed an objection to the closing of the estate and said there's a claim file in here you've got to deal with, Judge. Judge, I believe the proper thing to do is to give us standing in the program court, send it back, and require that the administrator, not the special administrator, put up a bond case until this court decides to keep it. Thank you, Mr. Gores. Mr. Holman, for your briefs and argument.